OPINION OF THE COURT
Gerard M. Weisberg, J.
Robert Johnson, having been convicted of three counts of forgery in the second degree, having served 747 days of his *538 sentence of 30 months to five years, and having been released after the Appellate Division, Second Department, reversed the conviction and dismissed the indictment (see, People v Johnson, 88 AD2d 922), filed this claim pursuant to Court of Claims Act § 8-b. It was assigned to Honorable Henry W. Lengyel of this court who, on Mr. Johnson’s motion, granted partial summary judgment in his favor on the question of liability based essentially on the rationale of the Appellate Division’s reversal, to wit, that the acts proven at Mr. Johnson’s criminal trial did not constitute the crimes charged. (Johnson v State of New York, Ct Cl, Apr. 14, 1989, Lengyel, J.) Thereafter, Judge Lengyel was forced to retire by the decision of the United States Supreme Court in Gregory v Ashcroft (501 US —, 111 S Ct 2395). Pursuant to rule 206.3 of the Uniform Rules for Trial Courts (22 NYCRR 206.3) and the order of Honorable Donald J. Corbett, Jr., Presiding Judge, dated October 23, 1991, the claim was reassigned to me in order to determine claimant’s[1] damages.
Pursuant to Court of Claims Act § 8-b and the case law thereunder, a claimant unjustly convicted and imprisoned is entitled to an award of damages that will fairly compensate him or her for lost wages and pain and suffering, including the humiliation and loss of freedom that incarceration subtends. (Black v State of New York, Ct Cl, Mar. 4, 1992, Corbett, P. J.)
Here, claimant submitted no proof of loss of wages and we therefore make no award under that category. As to pain and suffering, the proof was twofold: numerous regulations of the Department of Correctional Services, which govern inmate behavior, were introduced into evidence to illustrate the type of restrictions and lack of freedom under which Mr. Johnson was forced to live. Second, his relatives testified that although he had been incarcerated previously,[2] this imprisonment af *539 fected him emotionally much more negatively than the others, purportedly because it was unjust.
Thus, Mr. Johnson’s state of mind as a result of and in relation to the underlying cause of his incarceration was put in issue by him. Therefore, while the doctrine of the law of the case renders it inappropriate for us to redetermine the issue of the State’s liability, it is necessary and appropriate for us to review the basis of the conviction in order to evaluate his claim of emotional damage therefrom. In other words, if he was in fact guilty of some crime, and knew it, even if he was not charged with such crime, his assertion of outrage at an unjust incarceration would hardly ring true.
From the transcripts of the criminal trial which were introduced into evidence before us, it appears that a series of money orders, issued by an entity entitled Consumers Money Order, were stolen from a United Parcel Service (UPS) truck in Atlanta, Georgia. Seven of the money orders found their way into the hands of the decedent and his common-law wife, Tracey Johnson. Each bore the legend that it was not valid for an amount in excess of $200. Each was, at some point, completed in an amount of approximately $194. The only thing the Johnsons had to do to negotiate the money orders was to fill in one of their names as the owner/purchaser and to deliver them to the payees.
Mrs. Johnson signed her name to all of the money orders and they were delivered by the Johnsons to their landlord for rent, to a private school for their children’s tuition, and to Budget-Rent-A-Car for a vehicle. The latter three were apparently dishonored as having been stolen and resulted in the Johnsons’ arrest.
Prior to negotiating the money orders, the Johnsons told their friends and neighbors that they had received approximately $1,400 in the form of seven money orders as a gift. To some they said they had come from Mrs. Johnson’s father in Michigan; to others they had come from her uncle in Atlanta.
After the Budget money orders were dishonored (and after the Johnsons had returned the rental car), the police confronted them with the fact that the money orders had been *540 stolen. The Johnsons denied any knowledge of this and repeated their assertion that they had received them as a gift.
The Johnsons were both indicted in 1979. At trial, only 3 counts of the 7-count indictment were submitted to the jury: those which charged the Johnsons with the crime of forgery in the second degree with respect to the three money orders negotiated to Budget.[3]
At the criminal trial it was stipulated that the money orders had been stolen from a UPS truck. It was also uncontroverted that Mrs. Johnson had signed each in her own name as owner and the couple had negotiated them, in concert, to Budget. The sole issue in dispute was whether the couple had known they were stolen.
The jury convicted both on all three counts. Thus 12 jurors found beyond a reasonable doubt that both Johnsons had negotiated the three money orders to Budget knowing that they were stolen and with the intent to defraud it or Consumers. (Cf., Penal Law § 170.10 [intent to defraud is element of forgery].) Moreover, the verdict was supported by substantial evidence of guilt, not all of which was the jury even able to hear, to wit: that the decedent had a history of theft and of possession of stolen property; and that Tracey Johnson’s father failed to come forward to support their story of a gift, nor explain why seven approximately $200 money orders were sent instead of one for $1,400.
As indicated above, the Appellate Division reversed the conviction because Tracey Johnson, having signed her own true name, could not be guilty of forgery, and Robert Johnson, therefore, could not be guilty of aiding and abetting his wife to commit a noncrime. Be that as it may, as also indicated above, 12 jurors unanimously found beyond a reasonable doubt that the Johnsons had, in concert, negotiated stolen money orders that they knew to have been stolen with the intent to defraud Budget or Consumers. That is a crime. (See, Penal Law § 165.40.) Moreover, the decedent having been convicted of such in the past (see, n 2, supra), presumably knew its elements.
Thus, rather than having established that he was emotionally devastated by being incarcerated unjustly, we find that he was not only guilty of a crime, but that he knew before, during and after his conviction that he was guilty of some *541 thing. We therefore find unconvincing his relations’ assertions that he, believing himself innocent and unjustly convicted, found this particular incarceration so painful.
Since liability was determined, we must make an award of damages to the estate based on what claimant has proven. Certainly his lack of daily freedom was shown. However, as stated above, no evidence of lost wages was introduced. Moreover, in light of his prior criminal record, numerous incarcerations, and that he was guilty of a crime this time as well, we find that his loss of reputation, humiliation and pain were far less than a claimant with an unblemished record or an innocent mind would have suffered. Therefore, the decedent having been imprisoned for a crime he did not commit, and not having been for ones he did, and based on the totality of the circumstances, we award the estate $40,000 as just compensation. (Cf., Alexandre v State of New York, NYLJ, Mar. 31, 1989, at 24, col 1, affd 168 AD2d 472, appeal dismissed 77 NY2d 925; Carter v State of New York, 139 Misc 2d 423, affd 154 AD2d 642.)

. In the interim, Mr. Johnson died and his sister, Denise Johnson, as the administratrix of his estate has been substituted as claimant.

. Robert Johnson’s Criminal History Record shows the following:
[[Image here]]
*539 [[Image here]]

. The records submitted to us do not reflect the nature of the other four counts of the indictment.